IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROSE MARIE LANGLAND,

                Plaintiff,                OPINION AND ORDER

v.

                                          19-cv-981-wmc

COULEECAP,

                Defendant.

---

In this lawsuit, *pro se* plaintiff Rose Marie Langland alleges that defendant Couleecap, her former employer, discriminated against her on the basis of her disability and age in violation of the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"). Pending before the court are cross motions for summary judgment. (Dkt. ##31, 43.) As explained below, because the evidence offered by the parties would not permit a reasonable finder of fact to conclude that Langland was terminated from employment because of her disability or age, the court will grant Couleecap's motion for summary judgment, deny Langland's motion and enter judgment in Couleecap's favor.

UNDISPUTED FACTS[1]

Defendant Couleecap, Inc. is a 501c3 nonprofit corporation, whose mission is to

---

[1] Unless otherwise noted, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to the non-moving party. Since Langland did not respond to Couleecap's proposed findings of fact in accordance with this court's procedures, however, the court must deem Couleecap's proposed findings of fact undisputed. Moreover, Langland did not file her own proposed findings of fact in support of her motion for summary judgment, and instead listed multiple facts in the motion itself and attached multiple documents as supporting evidence. (*See* dkt. #43 and attachments.) Langland has not sworn to

serve the needs of low-income people and families in the Coulee Region of the state of Wisconsin. *See* https://www.couleecap.org/about.html (last visited Sept. 13, 2021). Couleecap hired plaintiff Langland as a Crisis Counselor on or about December 14, 2018, and terminated her two months later, on February 15, 2019. Langland was hired for a 20-hour per week position, and she agreed that it was her responsibility to complete those hours each week. (Langland Dep. (dkt. #41) 30.) Langland testified that during an initial meeting, team leader Jane Gaffney agreed she would be able to do the job from her home, using a computer and telephone. (*Id.* at 10-11.) During that meeting, Langland also told Gaffney that she and her husband were "disabled and being able to do a job at home on a computer by telephone was just perfect for us." (*Id*. at 11.) At summary judgment, Langland also represents in her brief that she was told to complete those 20 hours on her own time, and no one would be tracking her time.

When Langland attended a new hire orientation, she received instructions on Couleecap's policies for Reasonable Accommodation. As a crisis counselor, Langland understood her duties were to "go out and do [her] 20 hours," which included "find[ing] the people that were affected by the storms and then . . . go and meet with them to see if they still needed help in any way." (*Id.* at 12-13.) During her orientation, Langland was also

---

the truthfulness of the statements in that submission under penalty of perjury, and Langland has failed to follow the court's procedures for motions for summary judgment, which were provided to her and clearly state the requirement that she file a separate document setting forth proposed findings of fact. The court addresses these submissions in its analysis, given Langland's *pro se* status and the likelihood that that Langland would be able to testify to much of her assertions at trial. Regardless, as cited in the text above, Langland admitted to most of the key facts during her deposition.

informed that she would be performing jobs like attending town meetings, going door-to-door to talk to people, completing forms and handing out materials and fliers, as well as other job duties. Langland did *not* request an accommodation or notify anyone at Couleecap that these responsibilities were beyond her capabilities.

Since Langland was not meeting the expectations of outreach and presence in communities after her first month of employment, team leader Gaffney and an HR representative, Courtney Messer, met with Langland on January 18, 2019. During that meeting, Gaffney and Messer provided Langland a "Performance Improvement Plan." That plan included an outline of "Required Outcomes, Strategies, Responsibilities and Consequences" should Langland fail to achieve the identified outcomes by the final review date, which was set for February 15, 2019. The plan listed the following five outcomes:

1. Meet with individuals and families through coordinated home visits, and meet with clients at scheduled times, with or without a partner.

2. Attend community events and meetings, and deliver community presentations about disaster recovery and the Project Recovery program.

3. Document all contacts and outreach efforts as required.

4. Follow all Couleecap policies and procedures, including policies on requesting time off, code of conduct and employee behavior.

5. Conduct outreach activities, including canvassing, identifying and contacting individuals, and conducting listening sessions.

(Brown Aff., Ex. E (dkt. #35-4) 1.) The plan also listed nine strategies for Langland to apply to reach those outcomes, including that: her supervisor would issue her a 20-hour workweek schedule; Langland had to submit absence requests to her supervisor by 5:00 p.m. on the Thursday before the following week; she would conduct weekly appointments,

presentations and canvassing as scheduled and be on time; she would conduct three individual contact meetings per week; she would canvas a minimum of 20 homes per week; she would submit a daily activity log to her supervisor at the end of her shift; she would enter all contact data before the end of each shift and tally information for each week by Saturday; she would spend time on administrative activities; and she would attend weekly meetings with her supervisor.

During the same meeting, Langland acknowledged that she could request approval for an absence in writing, or by phone call, email or text message. However, Langland claims that she objected to the reporting requirement at the time, and she described her objection at her deposition:

> If you're, you know, working on your own, why do you have to report to your supervisor? If you, you know -- how do I explain it? You work your own hours. You set your own hours. As long as you put 20 hours in the week, you're fine. So this is telling me I have to report to a supervisor, tell them when I want to be off. And I'm the only one. Nobody else has to do this. That's discrimination right there.

(Langland Dep. (dkt. #41) 28.) Notwithstanding this objection, Langland acknowledged in the meeting that she was expected to perform the duties in the plan, while informing Gaffney and Messner that she was restricted in performing her job duties in the afternoon, citing a "disability." Although Langland did not identify the disability or explain why her afternoons were limited, Messer agreed that Langland could complete the duties identified in the plan during the morning hours, and Langland neither indicated that she needed any further accommodations to comply with the plan, nor did she elaborate further about the nature of her disability. As for consequences, the Performance Improvement Plan provided

as follows: "Failure by the employee to meet any of the above mentioned activities at any point during the duration of the Performance Improvement Plan will result in immediate disciplinary action, up to and including termination." (Brown Aff., Ex. E (dkt. #35-4) 3.) Langland and Gaffney both signed and dated the plan during that meeting.

As explained at her deposition, Langland believes that imposition of this Performance Improvement Plan is evidence that she was treated differently than another Crisis Counselor, Karen Hedblom, although she concedes that Hedblom notified her supervisor when she was going to be absent from work. (*Id.* at 29.) Langland also believes that another, younger and non-disabled employee, Julie Forsythe, was hired around the same time as her meeting with Gaffney and Messer, and despite Couleecap producing information to the contrary, believes Forsythe was hired to replace her.

After that meeting, Langland did not meet the five outcomes requirements of the plan, including: Langland failed to submit a daily activity log for January 23, 24 and 25, and February 7 and 8 of 2019; and on January 24, Langland ended her shift early but failed to communicate as much to her supervisor. Langland describes the latter as a "mistake," being that she was so cold it took her two hours to warm up, apparently causing her to forget to inform Gaffney that she left early. (*Id.* at 36, 39.) Langland also did not fulfill the outcome requiring her to present information at town meetings. For her part, Langland states that she introduced herself at a meeting, while Gaffney provided all of the information and answered questions. Finally, Langland failed to record 20 hours for seven weeks in a row between the week of December 24, 2018, and the week of February 11, 2019. For the two weeks of her employment that Langland actually completed 20 hours

of work, she worked *exactly* 20 hours, never making up the deficits from the other weeks.

At Langland's February 15, 2019, final review, Gaffney notified her that she had been terminated from her employment. During that meeting, Langland did not suggest that her disability impacted her ability to meet the outcomes set forth in the Performance Improvement Plan.

## OPINION

As noted, the parties each seek summary judgment on the merits of both plaintiff's ADA and ADEA claims. Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Similarly, when the parties cross-move for summary judgment, the court looks to the burden of proof that each party would bear on an issue at trial and requires the "burdened" party to go beyond the pleadings to establish a genuine issue of material fact. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If a party fails to establish the existence of an element essential to their case, and on which that party will bear the burden at trial, then summary judgment against that party is appropriate. *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

Since Langland bears the burden of proof on both her ADA and ADEA claims, therefore, the court's primary concern at summary judgment is whether she has introduced

sufficient evidence to "permit a reasonable fact finder to conclude that the plaintiff's . . . proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, (7th Cir. 2021) (quoting *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), *reh'g denied* (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018))). Moreover, although plaintiff may offer direct or circumstantial evidence in support of her claim, the Seventh Circuit has explained that "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

Defendant Couleecap seeks summary judgment based on "legitimate, nondiscriminatory reason[s]," maintaining that plaintiff has failed to submit evidence tending to show those reasons are "not credible" or are "factually baseless." *Fischer v. Avande*, 519 F.3d 393, 403 (7th Cir. 2008) (citation omitted). In opposition, plaintiff purports to call into question the legitimacy of the reasons for her termination, as well as maintains that she was treated worse than younger, non-disabled employees. On this record, neither of her positions has a basis in the evidence available at summary judgment.

Taking plaintiff's pretext argument first, she fails since the evidence of record does not support a reasonable inference that any Couleecap employee lacked a legitimate and honest belief Langland was not meeting expectations and failed to meet the requirements of the Performance Improvement Plan. *See Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 505 (7th Cir. 2017) ("'Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)).

In particular, while plaintiff would downplay the significance of failing to report her time and absences to Gaffney in the beginning of 2019 -- claiming that she could not work 20 hours each week because of "the holidays," and because she had to care for a sick dog that later died -- she has submitted no admissible evidence related to those issues. More importantly, she has submitted no evidence that her team leader *Gaffney* was even aware of these claimed hardships.

Plaintiff also challenges her failure to meet the Outcomes established in her improvement plan, arguing that she had helped set up town meetings and had the pertinent information, but did not speak because Gaffney was present to do so. She also would blame her spotty attendance on inclement weather and her inability to find a partner to walk door-to-door with her (as she was instructed). While plaintiff appears to suggest that she was trying to meet expectations, and thus, the reason for her termination was pretextual, the question is not whether Couleecap's termination decision was correct, but whether it was based on defendant's genuine belief that she was not meeting expectations. Indeed, to create a genuine dispute of material fact as to pretext, plaintiff had to "identify such weaknesses, implausibilities, inconsistencies, or contradictions" that would permit a reasonable fact-finder to find the termination reason "unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007)). At most, plaintiff argues that Gaffney held her too strictly to the requirements of the Performance Improvement Plan and weekly hours expectations, but plaintiff has submitted no evidence suggesting the Gaffney had reason to believe that her expectations were unreasonable or that plaintiff had met them. As such,

8

there is no reasonable basis to discredit the decision to terminate her, much less conclude that there is an issue of fact related to whether her termination was pretextual.

Second, as for evidence that she was treated less favorably than similarly situated employees that are not disabled and younger, plaintiff points to the treatment of two other employees. *See de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (noting that under the *McDonnell Douglas* burden-shifting framework, plaintiff can satisfy prima facie case of discrimination with evidence that she was treated worse than similarly situated employees not in a protected group). Plaintiff argues that Hedblom was not required to report her hours to a supervisor, but she is not a proper comparator, having reported absences to her supervisor, a step plaintiff refused to take. Plus, there is not evidence that Hedblom had problems meeting her workweek requirement that should have subjected her to a similar performance improvement plan, much less that she failed to meet the expectations of such a plan.

While plaintiff also points to Forsythe as an example of a younger and non-disabled employee treated more favorably, she fails to provide any details as to Forsythe's actual performance on the job. Instead, she merely claims defendant provided inaccurate information about the reasons for Forsythe's employment, suggesting that that this alone is proof of discrimination. Even if Forsythe had been hired as a possible replacement, it would not make such an anticipatory hire inappropriate for that reason alone, much less actionable. To the contrary, given the plaintiff's spectacularly bad performance to that point, such a "backup hire" would, if anything, appear to be a prudent business decision. Regardless, plaintiff provides no evidence supporting her speculation that this was the

reason for Forsythe's hiring.

Ultimately, when a plaintiff brings a claim challenging the employer's disciplinary action, "a proposed comparator is similar if the employees were disciplined by the same supervisor, were subject to the same performance standards, and engaged in misconduct of 'comparable seriousness.'" *Levy v. Wilkie*, 841 F. App'x 987, 992 (7th Cir. 2021) (quoting *de Lima Silva*, 917 F.3d at 559). Here, plaintiff has come forward with no evidence that either proposed comparator was even subject to a plan similar to her Performance Improvement Plan, nor that either comparator had similar issues with attendance and reporting their hours such that they *should* have been subject to such a plan and were not. Thus, plaintiff's reference to Hedblom's and Forsythe's employment also does not support an inference of discriminatory treatment.

Accordingly, defendant is entitled to summary judgment because plaintiff has failed to produce evidence suggesting that her termination was unrelated to her failure to meet the reasonable hours expected and requirements of her own performance improvement plan.[2]

---

[2] Defendant further seeks summary judgment with respect to plaintiff's ADA claim because of plaintiff's failure to inform *anyone* at Couleecap about the nature of her disability, or that she was unable to perform the duties that would require her to work out of the home. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 933 (7th Cir. 1995) ("[I]t is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability."). Plaintiff disputes this, pointing out that she told Gaffney that working from a computer was "perfect" because she and her husband were disabled. Although this appears to be a genuine dispute the should work in plaintiff's favor, the court need not resolve it, for all the reasons already addressed. Defendant also raises a merits-based argument for summary judgment as to plaintiff's ADEA claim, which the court also need not reach.

ORDER

IT IS ORDERED that:

1. Defendant Couleecap's motion for summary judgment (dkt. #31) is GRANTED.

2. Plaintiff Rose Marie Langland's motion for summary judgment (dkt. #43) is DENIED.

3. The clerk of court is directed to enter final judgment in defendant's favor and close this case.

Entered this 14th day of September, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge